UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

ARTHUR FIRSTENBERG,

     **Plaintiff,**

vs.                                   **11-CV-08 JAP/WDS**

CITY OF SANTA FE, NEW MEXICO and
AT&T MOBILITY SERVICES, LLC.

     **Defendants.**

## AMENDED MEMORANDUM OPINION AND ORDER

On January 28, 2011, AT&T Mobility Services, LLC (AT&T) filed Defendant AT&T Mobility Services, LLC's Motion To Dismiss Plaintiff's Claims Under Rule 12(b)(6) (Doc. No. 11) and Defendant AT&T Mobility Services, LLC's Memorandum In Support Of Its Motion To Dismiss Plaintiff's Claims Under Rule 12(b)(6) (Doc. No. 12) (together, Motion). On February 14, 2011, Plaintiff Arthur Firstenberg (Plaintiff) filed Plaintiff's Response To Defendant AT&T Mobility Services, LLC's Motion To Dismiss Under Rule 12(b)(6) (Doc. No. 20) (Response). On February 28, 2011, AT&T filed Defendant AT&T Mobility Services, LLC's Reply In Support Of Its Motion To Dismiss (Doc. No. 26) (Reply).  Because Plaintiff's Second Amended Petition For Writ Of Mandamus fails to state claims against AT&T on which relief can be granted, the Court will grant the Motion and will dismiss the claims against AT&T.

    I.  Standard of Review

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true and must view them in the

1

light most favorable to the plaintiff. *See Zinerman v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir.1984). Because Plaintiff is *pro se*, the Court will also construe his pleadings liberally. *Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009) (citing *Van Deelen v. Johnson*, 497 F.3d 1151, 1153 n.1 (10th Cir. 2007)). Nonetheless, *pro se* litigants must "follow the same rules of procedure that govern other litigants," and in particular the factual requirements of Rule 12(b)(6).*Garrett v. Selby Connor Maddux & Janner*, 425 F.3d 836, 840 (10th Cir. 2005) (brackets and internal quotation marks omitted). "This is so," the Tenth Circuit has explained, "because a *pro se* plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A "liberal construction" may require that a court look past a plaintiff's failure to cite proper legal authority, poor syntax, and even the omission of a crucial factual element in an otherwise satisfactory complaint, but "liberal construction" cannot salvage a claim based largely on conclusory assertions and/or patently inadequate allegations. *See id.*; *Giron v. Abascal*, 2007 WL 2002564, at *3-4 (D.N.M. 2007) (Hansen, J.) (unpublished).

Rule 12(b)(6) requires that a complaint set forth the grounds of a plaintiff's entitlement to relief through more than labels, conclusions and a formulaic recitation of the elements of a cause of action. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts sufficient to state a plausible claim of relief. *Id.* at 570. A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937, 1949 (2009).

II.  Background

Plaintiff resides in the City of Santa Fe, New Mexico and has been diagnosed with a condition known as electromagnetic sensitivity (EMS). Individuals who suffer from EMS are sensitive to the radio frequency radiation emitted from cell phones and cell towers (RF emissions). (Doc. No. 1-1 at 29.) These individuals experience symptoms such as seizures, hypertension, heart arrhythmia, severe insomnia, tinnitus, muscle spasms, twitching, insomnia, eye pain, dizziness, nausea, migraine headaches, respiratory problems, and neuropathy; and these symptoms impair their ability to stand, walk, think or breathe. (*Id.* ¶¶ 13(d), 17.) Because of this condition, Plaintiff is considered disabled and has collected disability benefits from the Social Security Administration since 1992. Plaintiff also alleges that he is a qualified individual as defined by the Americans With Disabilities Act, 42 U.S.C. 12102 et seq. (ADA).[1] Several of AT&T's cell towers located in Santa Fe transmit signals that produce radio frequency (RF) emissions that affect Plaintiff's condition.

On December 15, 2010, Plaintiff filed a Petition For Writ Of Mandamus (Doc. No. 1-1 at 2-11) in the First Judicial District Court, Santa Fe County, New Mexico.

On December 22, 2010, Judge Sarah M. Singleton of the First Judicial District Court Santa Fe County, New Mexico issued an Alternative Writ of Mandamus (Doc. No. 1-1 pp. 43-

---

[1] Under Title II of the ADA, a "qualified individual with a disability" is someone who, with or without reasonable modifications, meets the essential eligibility requirements to receive public services or participate in a public program. 42 U.S.C. § 12131(2). The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(2)(A). Title II of the ADA provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" includes "any State or local government." 42 U.S.C. § 12131(A).

45) (Writ). In the Writ, Judge Singleton ordered the City of Santa Fe to,

> . . . commence enforcement proceedings, as provided in §§ 14-11.5(a) and 14-6.2(E)(11) of its Land Development Code, by giving notice to AT&T that it must discontinue its 3G broadcasts within the City of Santa Fe within 30 days, and that it must submit an application for a Special Exception for each base station from which it proposes to broadcast such signals, or that it show cause before this court at the courtroom #250 at First Judicial District Court, 100 Catron Street, on the 3rd day of January 2011 at 3:30 pm why it has not done so.

(*Id.* ¶ 10.)

On December 28, 2010, Plaintiff filed a Motion To Amend Petition For Writ Of Mandamus, a Second Amended Petition for Writ Of Mandamus, an Order and a Certificate of Service. (*See* Doc. No. 1-1 at pp. 29-42.) The Second Amended Petition asked the court for leave to "change the identity of . . . AT&T, Inc. to AT&T Mobility Services LLC . . . a wholly owned subsidiary of AT&T, Inc. . . . ."  (*Id.* at p. 39.) The Court will refer to the Second Amended Petition for Writ of Mandamus as the "Petition." In the Petition, Plaintiff asks for a writ of mandamus to order the City to enforce its Land Development Code (LDC) and to regulate the RF emissions from AT&T's base stations. (Pet. ¶¶ 19-22.)

On January 5, 2011, Defendant AT&T Mobility Services, LLC (AT&T), with the City's consent, removed the case to this Court asserting that Plaintiff's claims "raise federal questions for which this Court has original subject matter jurisdiction." (*Id.* 1.) *See* 28 U.S.C. §§ 1331 (federal question jurisdiction), 1441(b) (removal), and 1446 (procedure for removal).

AT&T operates several cell phone transmission towers, called base stations, in the City of Santa Fe. (*Id.* ¶ 5) (listing 10 locations by address in the City of Santa Fe). Over the past several years, the City of Santa Fe has granted AT&T Special Exceptions under its LDC to construct the base stations. (*Id.*) On November 15, 2010, AT&T announced that beginning at 5:00 a.m. that morning, it began broadcasting "3G" signals from its base stations that were

previously transmitting "2G" signals.[2] (*Id.* ¶ 6.) AT&T did not apply for additional Special Exceptions from the City of Santa Fe before transmitting 3G signals from its base stations. (*Id.* ¶ 10.) Plaintiff has experienced symptoms of EMS to a greater degree since the base stations began transmitting 3G signals. (*Id.* ¶ 17.)

At a hearing held on November 17, 2010 on a matter unrelated to this lawsuit,[3] members of the City of Santa Fe's Board of Adjustment (Board) indicated that they believed the Board does not have the authority under its LDC to regulate the transmission of wireless 3G signals if the physical structure of a base station, such as its height, is not altered. (Pet. ¶¶ 12-17.) Plaintiff contends that AT&T should be required to apply for additional Special Exceptions for 3G transmissions because transmission of 3G signals constitutes a "more intense use" of the base stations under the LDC.

Under Section 14-3.6(B)(4)(b) of the LDC an additional Special Exception is necessary if there is any change in the intensity of use:

> The special exceptions listed in this chapter, when granted, are considered granted for a specific use and intensity, any change of use or **more intense use** shall be allowed only if such change is approved by the Board of Adjustment under a special exception.

LDC, § 14-3.6(B)(4)(b) (2001) (emphasis added).[4] Obtaining a Special Exception requires an

---

[2] Third Generation or "3G" Internet access technology provides users with global cell phone roaming capabilities, better voice quality using wireless internet access, and simultaneous voice and data services. Second Generation or "2G" Internet access technology also provides internet and mobile data services but at a slower rate. *See* http://www.wireless.att.com/learn/why/technology/3g-umts.jsp.

[3] Plaintiff alleges that the subject of this hearing was an appeal of antenna upgrades at two of AT&T's base stations, which are not the subject of this lawsuit. Plaintiff alleges that at the hearing, the Board heard statements from disabled individuals and their doctors describing how increases in radiation exacerbates their illnesses. (Pet. ¶ 12.)

[4] The LDC may be accessed at http://clerkshq.com/default.ashx?clientsite=Santafe-nm.

applicant to file an application, notify the surrounding neighborhood, meet with residents of the neighborhood, and attend a public hearing before the Board of Adjustment and possibly before the Historic Design Review Board or Planning Commission depending on the location. *Id.* at §§ 14-3.1 (A)-(H); 13-6.2(E)(6)(a).

Plaintiff requests the issuance of a writ of mandamus "directing the City of Santa Fe to commence enforcement proceedings under the LDC §§ 14-11.5(a)[5] and 14-6.2(E)(11)[6] and to order AT&T to discontinue its 3G broadcasts within the City of Santa Fe and to submit an application for a Special Exception for each base station from which it broadcasts 3G signals. (Pet. ¶ 26.) Plaintiff alleges that "[t]he City of Santa Fe is required to enforce its laws, as well as to take jurisdiction over the intensity of radio frequency radiation from permitted facilities, in order to fulfill its obligations under the ADA and the Constitution." (*Id.* ¶ 22.)

Plaintiff correctly asserts that he cannot bring his claims before the City's Board because under the LDC Plaintiff cannot appeal the City's decision not to enforce its LDC. Under the

---

[5] LDC § 14-11.5(A) provides,
(A) Remedies
If any building or structure is erected, . . . altered, . . . converted or maintained, or any building, structure, or land is used in violation of this chapter, or any of the regulations promulgated thereunder, the . . . proper City official **may institute any appropriate action or proceedings** to prevent such unlawful erection, . . . alteration, repair, conversion, maintenance or use; to restrain, correct or abate such violation; to prevent the occupancy of such building, structure or land; or to prevent any illegal act, conduct, business or use in or about such premises.
LDC § 14-11.5(A) (emphasis added).

[6] LDC § 14-6.2(E) governs the placement of and regulation of telecommunications facilities. Subsection (11) of this section provides in relevant part,
Any license, lease, permit or approval granted pursuant to this section may be revoked for the following reasons: . . . (viii) Violation of any material provisions of this section or of any material terms of any required licenses, leases and grants of authorization.
LDC § 14-6.2(E)(11)(viii).

LDC § 14-3.17(A)(1), only "final actions" of the Board may be appealed, and "final actions" do not include "a decision not to take enforcement action." LDC § 14.3.17(A)(1)(c)(iv). In addition, no application was made and no hearing was held before AT&T began transmitting 3G signals from the base stations identified by Plaintiff; thus the Board has not issued an appealable "final action." *Id.*

    III. Discussion

        A. Jurisdiction

    Defendants may remove state court actions that originally could have been filed in federal court under 28 U.S.C. § 1441. *Caterpillar. Inc. v. Williams*, 482 U.S. 386, 392 (1987). District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case arises under federal law if its 'well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.' " *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir.1994) (quoting *Franchise Tax Board v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983)). Thus, federal question jurisdiction may be appropriate if the state law claims implicate significant federal issues. *Nicodemus v. Union Pacific Corp.*, 440 F.3d 1227, 1232 (10th Cir. 2006) (citing *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 313 (2005)).

    Plaintiff's Petition asks for a writ of mandamus under New Mexico law directing the City to enforce its LDC, and this appears to be a claim implicating only local law. However, Plaintiff's claim hinges on whether the City has authority under the LDC to regulate wireless transmissions. To resolve this issue the Court must answer a "substantial question of federal law," which is whether the City can enforce its LDC in light of provisions of the

7

Telecommunications Act (TCA) that prohibit local governments from regulating telecommunications facilities through zoning laws on the basis of the environmental effects of RF emissions. *See* 47 U.S.C. § 332(c)(7)(B)(iv) (discussed *infra*).  In addition, Plaintiff invokes his right to protection under the ADA and under the Equal Protection and Due Process Clauses of the United States Constitution. Thus, the Court has jurisdiction to grant or deny mandamus relief under 28 U.S.C. § 1331. *See Hyde Park Co. v. Santa Fe City Council*, 226 F. 3d 1207, 1212 (10th Cir. 2000) (exercising jurisdiction over claim that city's denial of plat approval violated due process clause); *Norton v. Village of Corrales,* 103 F.3d 928, 929 (10th Cir. 1996) (exercising jurisdiction over claims that denial of approval for subdivision plat violated developer's procedural and substantive due process or equal protection rights).

### B. Standard for Mandamus Relief

A court may issue a writ of mandamus to compel performance of an affirmative act by an official where the duty to perform the act is clearly required by law and where there is no other plain, speedy and adequate remedy at law. *County of Santa Fe, N.M. v. Public Service Co. Of N.M.*, 311 F. 3d 1031, 1035 (10th Cir. 2002) (outlining requirements for mandamus under New Mexico law). Once a petitioner "show[s] that there was a valid ordinance in existence and that it was being violated, the duty cast upon the [government] bec[omes] ministerial and subject to enforcement by mandamus." *Id.* at 1036 (citations omitted).

### C. More Intense Use

AT&T's Motion first asserts that Plaintiff's claims must be dismissed because the transmission of 3G signals from its base stations does not constitute a "more intense use" of the base stations under LDC § 14-3.6(B)(4)(b). AT&T contends that it is therefore not required to apply for additional Special Exceptions from the City. Plaintiff counters that the 3G

transmissions increase the RF emissions from AT&T's base stations; therefore, AT&T is conducting a "more intense use" of its base stations. Plaintiff argues that the Court should issue a writ to the City requiring it to order AT&T to cease transmission of the 3G signals and to apply for additional Special Exceptions.

What constitutes a "more intense use" is not specifically defined in the LDC. Plaintiff, however, points to other sections of the LDC to discern the meaning of "more intense use." One of the examples comes from the general building construction section of the LDC, which sets forth a point allocation system for each type of design feature incorporated into a building. Under this section of the LDC, new construction must contain a minimum number of design features or points according to the zoning district. For example, under the category of "lighting," new commercial construction will be allocated 10 points for "low intensity" outdoor lighting that does not exceed a certain wattage; but higher wattage lights receive zero points. From this use of the concept of intensity, Plaintiff analogizes that increasing from 2G to 3G signals with its attendant affect on persons with EMS, comes within the meaning of a "more intense use" just as increased "intensity" of light would be discouraged under the design standards of the LDC.

AT&T argues that Plaintiff's interpretation of a "more intense use" under the LDC is too broad. AT&T contends that a "more intense use" of its base stations should result in a material change in the use of each base station--a use that would go beyond the use permitted by the original Special Exception. AT&T maintains that because it is using the base stations for the same purpose for which the Special Exceptions were previously granted–to provide wireless service–no additional Special Exception should be required. AT&T also asks the Court to consider the traditional concerns behind zoning regulations to discern the meaning of the phrase "more intense use."  Traditional zoning concerns, such as the increase in vehicle or pedestrian

traffic, the increase in light or noise from a structure, or a change in height or appearance of a facility, are not present here.  AT&T argues that transmission of 3G signals from the same towers that had transmitted 2G signals does not affect their use in the same way that an increase in vehicle traffic would constitute a change in the intensity of a use under the LDC.

More convincing to the Court, however, is AT&T's argument that the LDC itself does not differentiate between different types of wireless transmission signals from telecommunications facilities. In fact, under the specific section of the LDC governing telecommunication facilities, the type or strength of the wireless transmissions allowed from each facility is not even mentioned. *See* LDC § 14-6.2(E)(1)-(12) (entitled "Telecommunication Facilities"). In sum, the LDC section specifically governing telecommunications towers and antennas does not mention, much less limit, RF emissions, bandwidth, or the volume of wireless services provided by the base stations.

The Court must interpret the LDC under the rules of statutory construction, especially the maxim of statutory interpretation that instructs courts to give precedence to a statute of specific intention over one of general intention. *NISH v. Rumsfeld*, 348 F.3d 1263, 1272 (10th Cir. 2003). The "Telecommunication Facilities" section of the LDC governs only a base station's physical structure and the aesthetic impact of each base station's appearance.  Specific subjects addressed in this section include tower height restrictions, tower design standards that must conform with surrounding architecture, tower placement "set backs," landscaping, weed and trash control of tower sites, lighting prohibitions, noise control, signage restrictions, and the appearance of equipment shelters. LDC § 14-6.2(E)(1)-(12). In its regulation of telecommunication facilities, the LDC governs only the aesthetic and physical aspects of telecommunication facilities. The Court cannot order the City to require AT&T to apply for additional Special Exceptions in

10

connection with the transmission of 3G signals from its base stations because, when granting a Special Exception, the City does not take into account the type of signals emitted from the base stations. Similarly, the City would not take signal strength into account in deciding what constitutes a "more intense" use of the base stations. Therefore, the Court finds that as a matter of law, AT&T's transmission of 3G signals from its base stations does not constitute a "more intense use" of its base stations as that term is used in the City's LDC. More importantly however, even if the transmission of 3G signals could be considered a more intense use of the base stations, the Court cannot grant Plaintiff the relief he seeks because the regulation of RF emissions has been expressly preempted by Congress in the TCA.

### D.  Federal Preemption

AT&T's primary argument for dismissal of the Petition is that the City has no authority to commence enforcement proceedings against AT&T.  In the TCA, Congress expressly limited state and local governments' authority to regulate transmissions from wireless facilities if those facilities comply with the Federal Communication Commission's (FCC) regulations. The Petition does not allege that the transmission of 3G signals from the base stations violates the FCC regulations; thus, the section of the TCA is directly implicated here. *See* 47 U.S.C. § 332(c)(7)(B)(iv).

Congress enacted the TCA to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies. *Verizon Wireless (VAW) LLC v. City of Rio Rancho, NM,* 476 F. Supp. 2d 1325, 1327 (D.N.M. 2007) (citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005)). Congress also intended to promote a national cellular network and to secure lower prices and better service for consumers by opening all telecommunications markets to competition. *Id.*

11

(citing *Second Generation Props, L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1ˢᵗ Cir. 2002)). One of the ways in which the TCA accomplishes these goals is by reducing the impediments imposed by local governments on the installation of wireless communications facilities, such as antenna towers. *Id.* (citing *Abrams*, 544 U.S. at 115). In the TCA, however, Congress did preserve some local authority over land use. *Id.* The TCA allows local governments through zoning ordinances to regulate the placement and construction of wireless service towers and antennas but within specific limitations.

Section 332 of the TCA provides,

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(I) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof-

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities

shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(A) and (B) (I)-(iv).

AT&T argues that § 332(c)(7)(B)(iv) prohibits the City from regulating AT&T's transmission of 3G signals from its base stations if the reason for the regulation is to address the environmental effects of RF emissions. Courts have held that this provision expressly preempts state and local laws governing zoning and land use that are applied to deny permits for wireless facilities to control RF emissions. In *New Par v. City of Saginaw*, the Sixth Circuit Court of Appeals affirmed a district court's decision striking down a zoning board's denial of a wireless provider's variance request. 301 F.3d 390, 398 (6th Cir. 2002). In *New Par*, the City of Saginaw, Michigan denied a telecommunications tower permit citing the "health and safety issues regarding electromagnetic emissions." *Id.*  The district court and the Sixth Circuit concluded that the TCA, "explicitly prohibits local board decision-making 'on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.'" *Id.* Another court has held that "environmental effects"  within the meaning of § 332(c)(7)(B)(iv) include health concerns about the biological effects of RF radiation. *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 460 (S.D.N.Y. 2009) (citing *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 325 (2d Cir.2000) and *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 n. 3 (2d Cir.1999)).

13

As stated by the Tenth Circuit Court of Appeals in *RT Communications, Inc. v. FCC*, "preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law." 201 F.3d 1264, 1268-69 (10th Cir. 2000) (concluding that another provision in TCA preempted a Wyoming telecommunications statute). In § 332(c)(7)(B)(iv) Congress expressed a clear intent to prohibit local governing authorities from regulating RF emissions on the basis of their environmental and health effects. Because Plaintiff asks for relief that would require the City to regulate the transmissions from AT&T's base stations for the purpose of controlling  the "environmental effects" of RF emissions, Plaintiff's claim is preempted by the express language of § 332(c)(7)(B)(iv) of the TCA.

### E. The Americans With Disabilities Act

Plaintiff contends that despite the TCA's prohibition against the City's regulation of RF emissions, the City must comply with the ADA, which prohibits the City from discriminating against disabled individuals or denying the benefits of public services because of a disability, as defined by the ADA. *See generally,* 42 U.S.C. § 12102 et seq. Plaintiff appears to assert that because he is eligible for protection as a qualified individual with a disability under the ADA, his claims against the City and AT&T are not prohibited by the TCA.

The ADA defines "public entity" as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). AT&T is not a public entity, and therefore, Plaintiff fails to directly state a claim against AT&T under the ADA. However, the City falls within the definition of "public entity" in section 12131. Clearly, the City is subject to the ADA. 42 U.S.C. § 12132. To the extent that an order requiring the City to enforce its LDC under the ADA directly affects AT&T, this issue may be addressed in the context of AT&T's Motion.

14

To state a claim under the applicable provision of the ADA, a plaintiff must prove that: (1) he is a qualified individual with a disability; (2) he was excluded from the benefits or services of a public entity or otherwise was discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was because of his disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999) (setting out requirements for a Title II ADA claim); 42 U.S.C. § 12132. AT&T argues that Plaintiff has failed to state a plausible claim under the ADA because the ADA cannot be applied to require the City to regulate a private activity that might have a greater impact on persons with disabilities. AT&T cites *Safe Air For Everyone v. Idaho,* 469 F. Supp. 2d 884 (D. Idaho 2006) to support this argument. In the alternative, AT&T argues that the City has not denied Plaintiff any benefits and has not discriminated against Plaintiff under Title II of the ADA because the City's zoning regulations have been applied equally.

In *Safe Air*, the plaintiff, an organization representing individuals with cystic fibrosis and heart or respiratory disabilities, alleged that Idaho violated the ADA in its implementation of its Smoke Management Program (SMP) governing open field burning. *Safe Air*, 469 F. Supp. 2d at 886. The plaintiff argued that the class members were denied the benefits of the SMP, which were described as "access to the outdoors, public parks, streets, and the like[,]" because the State failed to accommodate their disabilities when implementing and administering the SMP. *Id.* The court rejected the plaintiffs' contention that because the state had chosen to regulate field burning, the state was under a duty to consider the needs of disabled individuals who were impacted by the smoke. *Id.* at 888. The Idaho District Court found that access to the outdoors, public parks, etc. were not benefits of the SMP and that both disabled and non-disabled citizens received the same "benefits" from SMP. *Id.* Furthermore, the court noted that the State could not

15

provide the benefits requested by the plaintiffs, i.e. access to the outdoors, because the alleged
benefits denied to the plaintiff were the result of smoke produced by private individuals and not
by the state, and therefore, the activity was beyond the reach of the ADA. *Id.* at 889. As
explained by the court, "this is not a case where a state requirement places a greater burden upon
disabled individuals. Instead the challenge here is to a regulatory scheme which controls the
actions of private individuals." *Id.* The court held that the state had not violated the ADA
because there was no denial of meaningful access to the benefits of the SMP and no
discrimination by the state in its SMP. *Id.* In sum, the *Safe Air* court determined that the ADA
does not require a state that regulates private activity to affirmatively protect disabled persons
who are negatively affected by the activity regulated.

Plaintiff urges the Court to follow another court, which held that a local government
violated the ADA by failing to adequately regulate private activity that negatively affected the
disabled. In *Heather K. v. City of Mallard*, 946 F. Supp. 1373 (N.D. Iowa 1996), plaintiff
suffered from respiratory and cardiac conditions aggravated by air particulates, such as smoke.
The plaintiff sued the City of Mallard, Iowa for violations of Title II of the ADA. Specifically,
Heather K. alleged that the city "failed to pass a city ordinance imposing reasonable limitations
on the backyard burning of residential waste." *Id.* at 1376. The court denied summary judgment
to the city because the allowance of open burning was a program, service or activity under the
ADA, and the city could be held liable for its discriminatory effect on plaintiff. *Id.*  Under this
holding, a local government would be required to regulate private activity that negatively
affected disabled persons. However, the court was not asked to reconcile a federal statute like the
TCA, which expressly prohibited the type of local regulation mandated by the ADA.

By contrast, in *Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2d Cir. 2000), the

plaintiffs argued that Federal Communication Commission (FCC) regulations which allowed for the proliferation of RF transmitters caused "electrically sensitive" people to be excluded from aspects of modern life and required state and local governments to discriminate in violation of the ADA. *Id.* at 88. The court found that the FCC, as a federal government body, cannot be liable under the ADA which applies to local and state governments. *Id.* The court, however, also found no violation of the Rehabilitation Act because the plaintiffs did not allege that electrically sensitive people were being denied benefits or were being subjected to discrimination under any "program or activity" of the FCC. *Id.*

The Court finds persuasive the reasoning in *Safe Air* and *Cellular Phone Taskforce*. Following those cases, the Court concludes that the City has not violated the ADA by failing to act under its LDC to regulate wireless transmissions because those transmissions have a negative affect on persons with EMS. *Safe Air*, 469 F. Supp. 2d at 889 (stating that the benefit of regulating field burning does not impose on the state the duty to consider the needs of disabled persons who are impacted by the smoke). Plaintiff has also failed to state a claim under the ADA because the TCA, enacted after the ADA, expressly prohibits the City from regulating RF emissions based on the effect those emissions have on individuals with EMS. *See New Par*, 301 F.3d at 398 (giving effect to TCA's prohibition of regulation of environmental effects of RF emissions).

Moreover, the specific provisions of the TCA indicate that Congress intended to preempt all laws, including the ADA, that might require the City to regulate the transmissions from AT&T's wireless service facilities due to the "environmental effects" of RF emissions. 47 U.S.C. § 332(c)(7)(B)(iv). It is a "fundamental tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect." *Sierra Club-Black Hills*

*Group v. United States Forest Service*, 259 F.3d 1281 (10th Cir. 2001) (finding that specific

federal statute governing the Norbeck Preserve preempted the general federal environmental and

forest management statutes that were the basis of a management plan that included the Norbeck

Preserve). Under this standard, the broad language of the ADA cannot override the specific

terms of the TCA. The ADA cannot mandate the City to regulate transmissions from AT&T's

wireless facilities to control RF emissions because the TCA expressly prohibits such regulation.

Moreover, the TCA grants to the FCC plenary authority to regulate RF emissions. *See Cellular*

*Phone Taskforce*, 205 F.3d at 96 (stating that the FCC has broad preemption authority under the

Telecommunications Act to regulate the environmental effects of radio transmissions).

   F. The TCA "Savings Clause"

  Plaintiff next argues that a "savings clause" in the TCA supports his argument that

Congress did not intend the TCA to preempt the ADA:

> NO IMPLIED EFFECT– This Act and the amendments made by this Act shall not be
> construed to modify, impair or supercede Federal, State, or local law unless expressly so
> provided in such Act or amendments.

47 U.S.C. § 152 notes. According to Plaintiff, § 332(c)(7)(B)(iv) does not supercede the ADA

because the provision does not mention the ADA or disabled individuals. Plaintiff contends

essentially that the ADA gives the City authority that the TCA expressly takes away from the

City. However, the TCA provision prohibiting local governments from regulating the

environmental effects of RF emissions expressly supercedes any attempt by local governments

to regulate RF emissions in a way that would apply the ADA to prohibit emissions that affect

persons, like Plaintiff, who may be harmed by the environmental consequences of the emissions.

Under the tenet of statutory construction that a court should not construe a general statute to

eviscerate a statute of specific effect, Plaintiff's argument fails. *See Sierra Club-Black Hills*

*Group*, 259 F.3d at 1287. Therefore, the TCA's savings provision does not allow the City to enforce its LDC to require AT&T to obtain additional Special Exceptions before transmitting 3G signals.

### G. Equal Protection Claim

Plaintiff contends that the City must regulate RF emissions regardless of the TCA's prohibition because the City must obey "the Fifth and Fourteenth Amendments of the Constitution, which guarantee to every citizen the equal protection of the laws, and provide that no citizen be deprived of life, liberty, or property without due process." (Pet. ¶ 20.)

The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "creates no substantive rights, instead, it embodies the general rule that governments must treat like cases alike. *Coalition for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008) (citation omitted). Courts have recognized successful equal protection claims brought by a "class of one," where a plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted). Courts have explained that " '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " *Id.* (citations omitted). However, "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* Disabled persons are not a suspect class for purposes of equal protection

analysis; therefore, laws affecting the disabled are not subject to strict scrutiny.  Instead, laws affecting the disabled must have a rational basis. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 442-46 (1985); *Davoll v. Webb*, 194 F.3d 1116, 1145 (10th Cir.1999). Plaintiff does not specifically allege how he was treated differently than other individuals who are not disabled or who are disabled in a different way. The zoning laws apply to all residents of Santa Fe. Plaintiff simply seems to argue that he should not be negatively impacted by the City's failure to enforce its LDC to regulate 3G transmissions.  However, the City has stated a rational basis for not enforcing its LDC, namely, Congress's prohibition of such regulation under the TCA and its grant of plenary authority to the FCC to regulate RF emissions. *See Cellular Phone Taskforce*, 205 F.3d at 96.

Plaintiff further alleges that Congress, presumably through the TCA, cannot authorize the States to violate the Equal Protection Clause. This argument appears to assert that the TCA's § 332(c)(7)(B)(iv) violates the Equal Protection Clause by precluding local governments from regulating the environmental effects of wireless facilities. The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359 (1973).  The test is whether the difference in treatment is an invidious discrimination. *Id.* Plaintiff does not allege that under the TCA he has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Oregon Dept. Of Agr.*, 553 U.S. 591, 600 (2008). Thus, Plaintiff has failed to state a valid claim of a violation of the Equal Protection clause.

### H. Due Process Claim

Plaintiff asserts in his Petition that he was "deprived of life, liberty, or property without

due process." (Pet. ¶ 20.) Plaintiff does not clarify whether he is claiming a violation of his procedural due process rights or his substantive due process rights. The Court will address both.

### 1. Procedural Due Process

The due process clause of the Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property without due process of law. . . ."  Procedural due process requires notice, a hearing, and a means of decision that does not offend the concept of fundamental fairness. *Hartwick v. Bd. of Tr. Of Johnson County Community College*, 782 F. Supp. 1507, 1511 (D. Kan. 1992). A plaintiff must meet a two-pronged test to establish a claim for violation of procedural due process rights. First, he must show that a life, liberty or a protected property interest was taken, and second, he must show that the procedural safeguards surrounding the deprivation were inadequate. *Board of Regents v. Roth*, 408 U.S. 564, 568-69 (1972); *Kirkland v. St. Vrain Valley Sch. Dist.*, 464 F.3d 1182, 1189 (10th Cir.2006). Plaintiff has not alleged that AT&T or the City have taken his life, liberty or a protected property interest without notice, hearing or means of decision. Hence, Plaintiff has not alleged a valid Due Process claim.

### 2. Substantive Due Process

The Tenth Circuit has stated the following with respect to substantive due process: An arbitrary deprivation of an individual's property right can violate the substantive component of the Due Process clause of the Fourteenth Amendment.  Any substantive due process claim must represent "more than an ordinary tort" and must "shock the conscience."  To reach that level, the government action must be deliberate, rather than merely negligent. *Clark v. City of Draper*, 168 F.3d 1185, 1190 (10th Cir. 1999) (citations omitted). To satisfy the "shock the

conscience" standard, the "'plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.'" *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998)(quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)). The plaintiff must instead "'demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'" *Id.* (quoting *Ulrig*, 64 F.3d at 574). Under this standard, the Plaintiff's claim fails because Plaintiff does not allege that the City failed to regulate AT&T's wireless transmissions intentionally or recklessly causing injury to Plaintiff by abusive behavior that shocks the conscience.

IT IS ORDERED that  Defendant AT&T Mobility Services, LLC's Motion To Dismiss Plaintiff's Claims Under Rule 12(b)(6) (Doc. No. 11) is granted and the Plaintiff's Second Amended Petition For Writ Of Mandamus will be dismissed as to AT&T Mobility Services, LLC.

_____
SENIOR DISTRICT COURT JUDGE