## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

**ARTHUR FIRSTENBERG,**

      **Plaintiff,**

**vs.**                            **11-CV-08 JAP/WDS**

**CITY OF SANTA FE, NEW MEXICO and
AT&T MOBILITY SERVICES, LLC.**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

This opinion addresses, among other questions, the following:

1. Whether the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7), (TCA)[1] preempts the authority of local governments to regulate cell tower radio frequency emissions (RFEs) on environmental grounds in order to protect persons who suffer from electromagnetic sensitivity (EMS) that is exacerbated by the RFEs.

2. Whether the TCA supercedes the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq., (ADA) so as to prevent local governments from regulating RFEs on the ground that they negatively affect qualified individuals with disabilities as defined in the ADA.

3. Whether the City of Santa Fe and Congress, in their regulation of RFEs, have violated Plaintiff's rights under the Equal Protection provisions of the Fifth and Fourteenth Amendments or the Due Process Clause of the Fourteenth Amendment.

### I. The City of Santa Fe's Motion to Dismiss

The issues are presented in the context of a Motion to Dismiss filed on January 31, 2011

---

[1] Section § 332(c)(7) was enacted as part of The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (Feb. 8, 1996). The TCA amended the Communications Act of 1934, Pub. L. No. 416 (June 19, 1934). The Communications Act of 1934 was also amended by the Communications Amendments Act of 1982, Pub. L. No. 97–259, 96 Stat. 1087 (Sept. 13, 1982). The Communications Act of 1934, the Communications Amendments Act of 1982, and Telecommunications Act of 1996 have been codified in 47 U.S.C. § 151 et seq.

by Defendant City of Santa Fe (City) (Doc. No. 16) (Motion). On February 14, 2011, Plaintiff

Arthur Firstenberg (Plaintiff ) *pro se* filed Plaintiff's Response To Defendant City of Santa Fe's

Motion To Dismiss (Doc. No. 21) (Response). On February 28, 2011, the City filed a Reply In

Support Of Motion To Dismiss By Respondent City of Santa Fe (Doc. No. 27) (Reply). The City

has also incorporated the arguments made by Defendant AT&T Mobility Services LLC (AT&T)

in its Motion To Dismiss Plaintiff's Claims Under Rule 12(b)(6) (Doc. No. 11) (AT&T's

Motion), which has been granted by the Court. *Memorandum Opinion and Order* (Doc. No. 42).

Because Plaintiff has failed to state a viable claim against the City, the Court will grant the

Motion and will dismiss Plaintiff's claims against the City.

## II.  Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss a complaint for "failure to state a

claim upon which relief can be granted." In ruling on a Rule 12(b)(6) motion to dismiss, the

Court must accept all well-pleaded allegations as true and must view them in the light most

favorable to the plaintiff. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*,

750 F.2d 810, 813 (10th Cir.1984). Rule 12(b)(6) requires a claimant to set forth the grounds

supporting his entitlement to relief through more than labels, conclusions and a formulaic

recitation of the elements of a cause of action. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007). To survive a Rule 12(b)(6) motion to dismiss, a claimant must allege facts sufficient to

state a plausible claim of relief.  *Id*. at 570. A claim is plausible when the claimant  pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the conduct alleged. *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937, 1949 (2009).

Because Plaintiff is *pro se*, the Court will also construe his pleadings liberally.  *Hall v.

*Witteman*, 584 F.3d 859, 864 (10th Cir. 2009) (citing *Van Deelen v. Johnson*, 497 F.3d 1151,

1153 n.1 (10th Cir. 2007)). Nonetheless, *pro se* litigants must "follow the same rules of procedure that govern other litigants," and in particular the factual pleading requirements of Rule 12(b)(6). *Garrett v. Selby Connor Maddux & Janner*, 425 F.3d 836, 840 (10th Cir. 2005) (brackets and internal quotation marks omitted). "This is so," the Tenth Circuit has explained, "because a *pro se* plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, a "liberal construction" cannot salvage a claim based largely on conclusory assertions or patently inadequate allegations. *See id.*, and *Giron v. Abascal*, 2007 WL 2002564, **3-4 (D.N.M. 2007) (Hansen, J.) (unpublished decision).

### III.  Background

Plaintiff resides in the City of Santa Fe, New Mexico and has been diagnosed with EMS. Individuals who suffer from EMS are affected by RFEs transmitted from cell phones and cell towers. (Doc. No. 1-1 at 29.) Several of AT&T's cell towers, also called "base stations," located in Santa Fe transmit signals that produce RFEs, which Plaintiff contends negatively affect his condition. Individuals with EMS experience symptoms such as seizures, hypertension, heart arrhythmia, severe insomnia, tinnitus, muscle spasms, twitching, eye pain, dizziness, nausea, migraine headaches, respiratory problems, and neuropathy. These symptoms impair their ability to stand, walk, think or breathe. (*Id. ¶¶* 13(d), 17.) Because of his EMS condition, Plaintiff is considered disabled and has collected disability benefits from the Social Security Administration

since 1992. Plaintiff also alleges that he is a qualified individual as defined by the ADA.[2]

On December 15, 2010, Plaintiff filed a Petition For Writ Of Mandamus (Doc. No. 1-1 at 2-11) in the First Judicial District Court, Santa Fe County, New Mexico asking for a court order requiring the City to order AT&T to cease 3G broadcasts and to apply for additional Special Exceptions for 3G transmissions.

On December 22, 2010, the Honorable State District Court Judge Sarah M. Singleton of the First Judicial District Court Santa Fe County, New Mexico issued an Alternative Writ of Mandamus (Doc. No. 1-1 pp. 43-45) (Writ). In the Writ, Judge Singleton ordered the City to

> . . . commence enforcement proceedings, as provided in §§ 14-11.5(a) and 14-6.2(E)(11) of its Land Development Code, by giving notice to AT&T that it must discontinue its 3G broadcasts within the City of Santa Fe within 30 days, and that it must submit an application for a Special Exception for each base station from which it proposes to broadcast such signals, or that it show cause before this court at the courtroom #250 at First Judicial District Court, 100 Catron Street, on the 3rd day of January 2011 at 3:30 pm why it has not done so.

(*Id.* ¶ 10.)

On December 28, 2010, Plaintiff filed a Motion To Amend Petition For Writ Of Mandamus. (Doc. No. 1-1 at p. 29.) In the attached Second Amended Petition for Writ of Mandamus (hereinafter, Petition), Plaintiff asked the court for leave to "change the identity of . . . AT&T, Inc. to AT&T Mobility Services LLC . . . a wholly owned subsidiary of

---

[2] Under Title II of the ADA, a "qualified individual with a disability" is someone who, with or without reasonable modifications, meets the essential eligibility requirements to receive public services or participate in a public program. 42 U.S.C. § 12131(2). The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of the individual." *Id.* § 12102(2)(A).

AT&T, Inc. . . ." (*Id.* at p. 39.)[3] In the Petition, Plaintiff also asked for a writ of mandamus ordering the City to enforce its Land Development Code (LDC) and to regulate the RFEs from AT&T's base stations. (Pet. ¶¶ 19-22.)[4]

On January 5, 2011, Defendant AT&T, with the City's consent, removed the case to this Court asserting that Plaintiff's claims "raise federal questions for which this Court has original subject matter jurisdiction." (*Id.* 1.) *See* 28 U.S.C. §§ 1331 (federal question jurisdiction), 1441(b) (removal), and 1446 (procedure for removal).

AT&T operates several base stations in the City. (*Id.* ¶ 5) (listing 10 locations). Over the past several years, the City has granted AT&T Special Exceptions under its LDC to construct the base stations. (*Id.*) On November 15, 2010, AT&T announced that beginning at 5:00 a.m. that morning, it began broadcasting "3G" signals from its base stations that were previously transmitting "2G" signals.[5] (*Id.* ¶ 6.) AT&T did not apply for additional Special Exceptions from the City before transmitting 3G signals from its base stations. (*Id.* ¶ 10.) Plaintiff has experienced symptoms of EMS to a greater degree since the base stations began transmitting 3G signals. (*Id.* ¶ 17.)

_____

[3] The state court allowed the substitution of AT&T Mobility Services LLC in place of AT&T, Inc.

[4] The LDC may be accessed at http://clerkshq.com/default.ashx?clientsite=Santafe-nm.

[5] Third Generation or "3G" internet access technology provides users with global cell phone roaming capabilities, better voice quality using wireless internet access, and simultaneous voice and data services. Second Generation or "2G" internet access technology provides internet and mobile data services at a slower rate. *See* http://www.wireless.att.com/learn/why/technology/3g-umts.jsp.

At a hearing held on November 17, 2010 on a matter unrelated to this lawsuit,[6] members of the City's Board of Adjustment (Board) indicated that they believed the Board did not have the authority under its LDC to regulate the transmission of wireless 3G signals if the physical structure of a base station, such as its height, is not altered. (Pet. ¶¶ 12-17.) Plaintiff contends that the City should require AT&T to apply for additional Special Exceptions for 3G transmissions because the transmission of 3G signals from base stations that had previously transmitted only 2G signals constitutes a "more intense use" under the LDC. (*Id.* at ¶¶ 6, 9, 10.)

Under Section 14-3.6(B)(4)(b) of the LDC an additional Special Exception is necessary for a more intense use of a structure:

> The special exceptions listed in this chapter, when granted, are considered granted for a specific use and intensity, any change of use or **more intense use** shall be allowed only if such change is approved by the Board of Adjustment under a special exception.

LDC, § 14-3.6(B)(4)(b) (2001) (emphasis added). Obtaining a Special Exception requires an applicant to, among other things, file an application, notify the surrounding neighborhood, meet with residents of the neighborhood, and attend a public hearing before the Board and possibly before the Historic Design Review Board or Planning Commission depending on the location. *Id.* at §§ 14-3.1 (A)-(H); 13-6.2(E)(6)(a).

Plaintiff asks the Court to issue a writ of mandamus "directing the City of Santa Fe to

---

[6] Plaintiff alleges that the subject of this hearing was an appeal of antenna upgrades at two of AT&T's base stations, an issue not raised in this lawsuit. Plaintiff alleges that at the hearing, the City's Board of Adjustment heard statements from disabled individuals and their doctors describing how radiation from base stations exacerbates their illnesses. (Pet. ¶ 12.)

commence enforcement proceedings under the LDC §§ 14-11.5(a)[7] and 14-6.2(E)(11);[8] to order

AT&T to discontinue its 3G broadcasts within the City of Santa Fe; and to submit an application

for a Special Exception for each base station from which it transmits 3G signals. (Pet. ¶ 26.)

Plaintiff alleges that the City ". . . is required to enforce its laws, as well as to take jurisdiction

over the intensity of radio frequency radiation from permitted facilities, in order to fulfill its

obligations under the ADA and the Constitution." (*Id.* ¶ 22.)

Plaintiff correctly asserts that he has no adequate remedy at law and no administrative

---

[7] LDC § 14-11.5(A) provides:

(A) Remedies
If any building or structure is erected, . . . altered, . . . converted or maintained, or any
building, structure, or land is used in violation of this chapter, or any of the regulations
promulgated thereunder, the . . . proper City official **may institute any appropriate
action or proceedings** to prevent such unlawful erection, . . . alteration, repair,
conversion, maintenance or use; to restrain, correct or abate such violation; to prevent the
occupancy of such building, structure or land; or to prevent any illegal act, conduct,
business or use in or about such premises.

LDC § 14-11.5(A) (emphasis added).

[8] LDC § 14-6.2(E) governs the placement of and regulation of telecommunications
facilities. Subsection (11) of this section provides in relevant part:

Any license, lease, permit or approval granted pursuant to this section may be revoked
for the following reasons: . . . (viii) Violation of any material provisions of this section or
of any material terms of any required licenses, leases and grants of authorization.

LDC § 14-6.2(E)(11)(viii).

remedy.[9] Plaintiff cannot bring his claims before the City's Board because, by the language of

the LDC, Plaintiff cannot appeal the City's decision not to enforce its LDC. Under the LDC §

14-3.17(A)(1), only "final actions" of the Board may be appealed, and "final actions" exclude "a

decision not to take enforcement action." LDC § 14.3.17(A)(1)(c)(iv). In addition, no application

was made and no hearing was held before AT&T began transmitting 3G signals from the base

stations; thus, the Board has not issued an appealable "final action." *Id.*

**IV. Discussion**

**A. Jurisdiction Regarding Mandamus Relief**

Before addressing the questions posed in the introduction of this opinion, the Court will

consider two preliminary matters raised in the parties' briefing: 1) whether the Court has

jurisdiction to grant or deny the mandamus relief Plaintiff requests and 2) whether the City lacks

authority under its LDC to regulate transmissions from telecommunications base stations.

Under 28 U.S.C. § 1331, the Court has jurisdiction to grant or deny mandamus relief in

─────────────────────

[9] A court may issue a writ of mandamus to compel performance of an affirmative act by
an official where the duty to perform an act is clearly required by law and where there is no
adequate remedy at law. *See County of Santa Fe, N.M. v. Public Service Co. of N.M.*, 311 F. 3d
1031, 1035 (10th Cir. 2002) (outlining requirements for mandamus under New Mexico law). In
the Motion, the City argues that Plaintiff's request for mandamus relief should be denied because
Plaintiff has an adequate remedy at law in the Board process. *See, e.g., Birdo v. Rodriguez*, 501
P.2d 195, 197 (N.M. 1972) (holding that writ of mandamus was not proper because the party
seeking the writ has not exercised statutory right to appeal administrative decisions to the district
court). However,  Plaintiff persuasively argues that the Board would refuse to act on any request
to address 3G transmissions. Under the LDC, the Board's failure to enforce its regulations is not
an appealable decision. Thus, even a "final decision" by the Board not to enforce the LDC would
not itself be appealable.

In addition, the City contends that Plaintiff has failed to exhaust his administrative
remedies. But, Plaintiff is not required to exhaust his administrative remedies when no
administrative remedy is available. *See Alamo Navajo School Bd. v. Andrus*, 664 F.2d 229, 233
(10th Cir. 1981) (stating, "[m]andamus does not supersede other remedies, but rather comes into
play where there is a want of such remedies.") (citation omitted).

this case because the Plaintiff asks for relief based on rights granted under the ADA and under the United States Constitution. *See Hyde Park Co. v. Santa Fe City Council*, 226 F. 3d 1207, 1212 (10th Cir. 2000) (exercising jurisdiction over claim that city's denial of plat approval violated the Due Process Clause); *Norton v. Village of Corrales,* 103 F.3d 928, 929 (10th Cir. 1996) (exercising jurisdiction over claims that denial of approval for a subdivision plat violated developer's procedural and substantive due process or equal protection rights). In addition, the Court has jurisdiction to determine whether mandamus relief is prohibited under the TCA. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1264-69 (10th Cir. 2004) (stating that federal jurisdiction exists to decide TCA's preemption of local zoning decisions).

## B.  Authority of the City's Board of Adjustment Under the City's LDC

The City argues that the Court cannot compel it to regulate AT&T's 3G transmissions because the City lacks the authority under its LDC to regulate the transmissions from telecommunications facilities. The Court agrees. The LDC's section governing telecommunications facilities grants the City authority to regulate only a base station's physical structure and the aesthetic impact of each base station's appearance. The LDC mentions, specifically, regulations of tower height, design, placement, landscaping, lighting prohibitions, noise control, signage restrictions, and the appearance of equipment shelters. *See generally,* LDC § 14-6.2(E)(1)-(12). Signal transmissions are not included in the LDC regulations. Therefore, the transmission of 3G signals would not constitute a "more intense use" of the base stations because the LDC regulations do not even refer to the intensity of transmissions from these facilities. However, even if the transmission of 3G signals could be considered a more intense use of the base stations, the Board has no authority to regulate wireless transmission signals because Congress in the TCA has preempted local governments from regulating RFEs if they are within

9

the standards dictated by the Federal Communications Commission (FCC).

The Court now turns to the issues stated in the introduction.

### C. The TCA expressly preempts local regulation of RFE's

"Congress enacted the Telecommunications Act of 1996 (TCA) . . . to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'" *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). Congress also intended to promote a national cellular network and to secure lower prices and better service for consumers by opening all telecommunications markets to competition. *Verizon Wireless (VAW) LLC v. City of Rio Rancho, NM,* 476 F. Supp. 2d 1325, 1327 (D.N.M. 2007) (citing *Second Generation Props, L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1st Cir. 2002)). One of the ways in which the TCA accomplishes these goals is by reducing the impediments imposed by local governments on the installation of wireless communications facilities, such as antenna towers. *Id.* (citing *Abrams*, 544 U.S. at 115). However, Congress preserved some local authority over land use.

Section 332 of the TCA provides,

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(I) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof-

10

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

**(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.** . . .

47 U.S.C. § 332(c)(7)(A) and (B) (I)-(iv) (emphasis added).

In § 332(c)(7)(B)(iv), Congress expressly limited state and local governments' authority to regulate placement, construction, and modification of wireless facilities on the basis of the environmental effects of RFEs if those facilities comply with the FCC's regulations. *Id.* Another section of the TCA has been held to preempt local and state regulations as well. *See, e.g., Qwest Corp*, 380 F.3d at 1270-71 (holding that in § 253 of the TCA, Congress preempted local regulation that effectively prohibits placement of facilities through costly lease payments and dedication requirements); *RT Communications, Inc. v. Federal Communications Commission,* 201 F.3d 1264, 1267-69 (10th Cir. 2000) (concluding that TCA § 253 preempted a Wyoming statute granting protection from competition to local exchange carriers).

Courts have held that § 332(c)(7) preempts certain local zoning regulations.  In *New Par*

*v. City of Saginaw*, a wireless service provider sued the City of Saginaw, Michigan alleging that the city denied its request for a zoning variance in violation of § 332(c)(7). *New Par v. City of Saginaw*, 301 F.3d 390, 392 (6ᵗʰ Cir. 2002) (affirming district court decision). In *New Par*, the district court found that the city violated 47 U.S.C. § 332(c)(7)(B)(iii) because the decision was not based on substantial evidence contained in a written record. *Id.* at 398. At a hearing before Saginaw's Board of Appeals on Zoning, individuals opposing the variance also voiced concern about the "health and safety issues regarding electromagnetic emissions." *Id.* The district court concluded that under § 332(c)(7)(B)(iv), "health issues" could not validly form the basis for the denial of a variance. *Id.*

In *T-Mobile Northeast LLC v. Town of Ramapo*, T-Mobile, alleged that the Town of Ramapo, New York violated § 332(c)(7) when, after a twenty-two-month application process, the Town rejected T-Mobile's application to construct a wireless communications tower on Town property. 701 F. Supp. 2d 446, 454 (S.D.N.Y. 2009). The court held that the Town's denial of T-Mobile's application was a prohibition on wireless services under § 332(c)(7)(B)(i)(II), was not based on substantial evidence in violation of § 332(c)(7)(B)(iii), and was unlawfully grounded in concerns about the proposed facility's "environmental effects" under § 332(c)(7)(B)(iv). *Id.* at 454-64. The court also concluded that "[e]vironmental effects within the meaning of [§ 332(c)(7)(B)(iv)] . . . include health concerns about the biological effects of RF radiation." *Id.* at 460 (citing *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 325 (2d Cir.2000) and *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 n. 3 (2d Cir.1999)).

The court in *Ramapo* held that the Town of Ramapo violated § 332(c)(7)(B)(iv) by denying a variance for a cell tower due in part to "health" concerns related to RFEs. *Id.* In this

case, if the City is required to order AT&T to cease 3G transmissions and to apply for a Special Exception to transmit 3G signals, the City would be regulating the modification of the base stations due to the effect of RFEs on persons with EMS, and this type of regulation is prohibited under § 332(c)(7)(B)(iv). In § 332(c)(7)(B)(iv), Congress expressed a clear intent to preempt local governing authorities from regulating RFEs on the basis of their environmental and health effects. Because Plaintiff asked for relief that would require the City to regulate the transmissions from AT&T's base stations for the purpose of controlling the "environmental effects" of RFEs, Plaintiff's claim fails.

### D. The TCA supercedes the ADA as to Plaintiff

Plaintiff contends that despite the TCA's prohibition against the City's regulation of RFEs, the City must regulate RFEs to comply with the ADA. Plaintiff appears to assert that because he is a qualified individual with a disability that is exacerbated by RFEs, his rights under the ADA must be protected by the City through its zoning ordinance even though the TCA prohibits the City from considering the environmental effects of RFEs in the placement and modification of cell towers. 47 U.S.C. § 332(c)(7)(B)(iv). Before looking at whether the TCA's prohibition preempts the ADA, the Court will determine whether the ADA applies in this case. The Court will assume that Plaintiff is a qualified individual with a disability as alleged in the Petition.

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To have protection under the ADA, a qualified individual with a disability must show that he was either excluded from participation in or denied the benefits of a

13

public entity's services, programs, or activities. In the alternative, a qualified individual with a disability may state a claim under the ADA if he was otherwise discriminated against by the public entity. *See Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999) (citations omitted) (setting out requirements for a Title II ADA claim). In addition, a qualified individual must show that the exclusion, denial of benefits, or discrimination was by reason of the individual's disability. *Id.*; 42 U.S.C. § 12132. Consequently, before the ADA can apply to this case, Plaintiff must allege that the City, by reason of Plaintiff's disability, either (1) excluded him from participating in or denied him the benefits of services, programs, or activities; or (2) otherwise subjected him to discrimination by failing to regulate RFEs.

First, the City argues that Plaintiff is not protected by the ADA because the City is not required under the ADA to regulate a private activity that has a greater impact on persons with disabilities. The City cites *Safe Air For Everyone v. Idaho*, 469 F. Supp. 2d 884 (D. Idaho 2006) in support of this contention. Alternatively, the City maintains that it has not denied Plaintiff any "benefits" because the City does not provide telecommunications services that affect Plaintiff's condition. The City also argues that it has not discriminated against Plaintiff under the ADA because the City's zoning regulations have been applied equally. *Mork v. Salt Lake City UT.*, No. 2:03-CV-686 PGC, 2005 WL 3050990, *8 (D. Utah Nov. 15, 2005) (unreported decision) (stating, "[i]f the prohibition or denial was universal, there is no way it could have been based on [claimant's] disability, as required for recovery under the ADA."). Plaintiff's contention that the ADA requires the City to regulate RFEs is very similar to the plaintiffs' contentions in *Safe Air*.

In *Safe Air*, a private foundation and several Idaho residents with breathing disabilities sued the State of Idaho and Idaho Department of Agriculture (ISDA) under the ADA because the State allowed farmers to burn fields with wheat stubble under a Smoke Management Program.

469 F. Supp. 2d at 886. The plaintiffs alleged that the State discriminated against them under the ADA because the State failed to consider or determine alternatives or modifications that would eliminate or restrict agricultural burning. *Id.* The plaintiffs alternatively alleged that the State precluded the plaintiffs from enjoying all rights, privileges and accommodations available to all other citizens of Idaho. *Id.* According to the plaintiffs, their access to the outdoors and to public parks and streets should be considered as "benefits" denied to them caused by the State's failure to accommodate their disabilities. *Id.* at 888. The court, however, dismissed the suit concluding that the ADA does not require a state that regulates private activity to affirmatively protect disabled persons who are negatively affected by the activity regulated. *Id.* at 888-89. The court also found that the plaintiffs failed to allege that the State's actions in allowing burning, issuing permits, and either failing to limit or eliminate burning were taken **because of** plaintiffs' disabilities. *Id.* at 888 (emphasis added). The court rejected the plaintiffs' argument that since the State had undertaken the job of regulating field burning, the State was under a duty to consider the needs of disabled individuals who were impacted by the smoke and to provide necessary accommodations. *Id.* Finally, the court found that the plaintiffs' access to the outdoors was not a benefit required to be provided by the State:

> While the Court does not dispute that Plaintiffs suffer a greater impact than other citizens from smoke in the air, their claims here fail because they have equal access to the **benefit** provided by the State by way of the Smoke Management Plan. The State is not required to assure the disabled greater benefits than provided to non-handicapped but only that all citizens are equally able to access the benefits of the services provided. . . . The State's Smoke Management Plan does not discriminate against disabled individuals based upon their disabilities by failing to consider and take into account any needs such individuals may require in order to access public services. Instead, the regulation provides equal access for all citizens to its benefits.

*Id.* at 888-89 (emphasis added).

The private activity regulated in *Safe Air*, the creation of smoke through field burning, is

15

analogous to the private activity regulated here, the transmission of wireless signals. Just as the State of Idaho was not required under the ADA to eliminate the effect of its Smoke Management Program on individuals with breathing disabilities, the City is not required under the ADA to regulate the placement or modification of AT&T's base stations to minimize the effect of RFEs on disabled individuals with EMS. In sum, the ADA does not apply to the private activity regulated by the City through its zoning laws.

The City argues that even if the ADA applies to this case, the TCA, enacted after the ADA, expressly prohibits the City from regulating RF emissions based on the effect those emissions have on individuals with EMS. *See New Par*, 301 F.3d at 398 (giving effect to TCA's prohibition of regulation of environmental effects of RFEs). This argument is valid especially in light of the fact that Congress enacted the TCA after the ADA and in the TCA could have allowed states and local governments to regulate RFEs if Congress thought that doing so would fulfill its duties under the ADA. However, in the TCA, Congress expressly preempted all laws, including specifically laws that purport to regulate the placement or operation of cell towers based on the effect of RFEs. It is a "fundamental tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect." *Sierra Club-Black Hills Group v. United States Forest Service*, 259 F.3d 1281 (10th Cir. 2001) (finding that specific federal statute governing the Norbeck Preserve preempted the general federal environmental and forest management statutes that were the basis of a management plan that included the Norbeck Preserve). Under this standard, the broad language of the ADA prohibiting discrimination against the disabled cannot override the specific terms of the TCA with regard to regulating RFEs. Congress, however, did not leave a regulatory vacuum; instead, it granted plenary regulatory authority to the FCC. *See Cellular Phone Taskforce v. FCC*, 205 F.3d at 96 (stating

16

that Congress gave the FCC broad preemption authority under the TCA to regulate the environmental effects of radio transmissions). Thus, if the 3G transmissions comply with the FCC's regulations, and Plaintiff has not alleged otherwise, then those transmissions cannot be regulated by the City even though the City must also comply with the ADA.

### E. The TCA "Savings Clause" does not avoid preemption of the ADA

Plaintiff next argues that a "savings clause" in the TCA supports his argument that Congress did not intend the TCA to preempt the ADA:

> NO IMPLIED EFFECT– This Act and the amendments made by this Act shall not be construed to modify, impair or supercede Federal, State, or local law **unless expressly so provided in such Act or amendments.**

Pub. L. No. 104-104, § 601(c)(1), 110 Stat. 143 (1996) (reprinted in 47 U.S.C. § 152, historical and statutory notes).

According to Plaintiff, § 332(c)(7)(B)(iv) does not supercede the ADA because it does not mention the ADA by name. Plaintiff contends essentially that the ADA gives the City authority that the TCA expressly takes away from the City. However, the TCA provision prohibiting local governments from regulating the environmental effects of RFEs expressly supercedes any attempt by local governments to regulate RFEs. This prohibition in the TCA governs even if a city attempts to apply the ADA to regulate emissions that affect disabled persons, like Plaintiff. Since a court should not construe a general statute to eviscerate a specific statute, Plaintiff has failed to convince the Court that the general savings clause in 47 U.S.C. § 152 negates the specific provisions of § 332(c)(7)(B)(iv). *See Sierra Club-Black Hills Group,* 259 F.3d at 1287. Therefore, the TCA's savings provision does not allow the City, acting under the ADA, to require AT&T to cease transmitting 3G signals and to obtain additional Special Exceptions for those signals.

**F.  The City has not violated Plaintiff's rights under the Equal Protection Clause**

Plaintiff generally contends that the City should regulate RFEs, despite the TCA's prohibition, to fulfill the City's obligation under "the Fifth and Fourteenth Amendments of the Constitution, which guarantee to every citizen the equal protection of the laws, and provide that no citizen be deprived of life, liberty, or property without due process." (Pet. ¶ 20.) Plaintiff asserts, "[i]f regulation of radio frequency radiation is required in order to comply with the [ADA] and the Constitution, a city is obligated to do so." (Pet. ¶ 22.) Plaintiff's allegations raise the issue of whether the City has violated Plaintiff's equal protection rights.

The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "creates no substantive rights, instead, it embodies the general rule that governments must treat like cases alike." *Coalition for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008) (citation omitted).

Courts have recognized successful equal protection claims brought by a single plaintiff or a "class of one," where a plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000) (citations omitted). Courts have explained that "'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Id.* (citations omitted). Plaintiff's complaint can fairly be construed as a "class of one" equal protection claim because Plaintiff alleges that the City refused to regulate

18

RFEs and that failure unfairly discriminated against him due to his EMS condition.

However, the Plaintiff's equal protection claim against the City is not sufficient because Plaintiff does not allege any facts to support a finding that the City's failure to regulate RFEs, or Congress' prohibition of such regulation, was "irrational and wholly arbitrary." *Id.* (finding sufficient allegations that Village acted irrationally and arbitrarily in its zoning decision). The City has given a rational basis for its failure to regulate RFEs, i.e. Congress' prohibition of such regulation under the TCA and Congress' grant of plenary authority to the FCC to regulate RFEs. *See Cellular Phone Taskforce*, 205 F.3d at 96. And, Congress' rational basis for prohibiting local governments from regulating RFEs and for giving plenary authority to the FCC in this area stems from a desire for uniform federal standards applicable to telecommunications facilities. *Cellular Phone Taskforce*, 205 F.3d at 96 (recognizing Congress' authority to regulate private activity including preempting local laws regulating RFEs under the Commerce Clause). Thus, Plaintiff has failed to state a claim against the City for a violation of the Equal Protection Clause. *But cf. Chatman v. Barnes*, 357 F. Supp. 9, 16 (D. Okla. 1973) (finding that Oklahoma law that allowed payment of welfare benefits to persons disabled as adults on a different basis than payments to persons who were disabled from childhood had no rational basis and violated the equal protection clause).

Plaintiff also asserts that the TCA's § 332(c)(7)(B)(iv) violates his right to equal protection under the Fifth Amendment by precluding the City from regulating RFEs that are harmful to him. Although Federal law must comply with the due process requirements of the Fifth Amendment, the equal protection analysis under the Fifth Amendment due process clause is the same as the analysis applied under the Fourteenth Amendment. *See Currin v. Wallace*, 306 U.S. 1 (1939); *Buckley v. Valeo*, 424 U.S. 1 (1976). The Equal Protection Clause does not

prohibit Congress from drawing lines that have a different effect on a non-suspect class of individuals like disabled persons.[10] *Sanders ex rel. Rayl v. Kansas Dept. of Social and Rehabilitation Services,* 317 F. Supp. 2d 1233, 1252 (D. Kan. 2004) (stating that state agency could rationally determine that the hardships facing institutionalized persons under 21 years old who have cystic fibrosis are more substantial than the hardships facing other disabled persons). The test is whether the difference in treatment is based on invidious discrimination without a rational basis. *City of Cleburne*, 473 U.S. at 446. Plaintiff has failed to sufficiently allege that in enacting the TCA, Congress discriminated against individuals with EMS because Congress lacked a rational basis for prohibiting local governments from regulating RFEs. *Id.* Congress' decision to place plenary regulatory authority with the FCC as opposed to local governments meets the requirements of the Fifth Amendment's equal protection strictures. Thus, Plaintiff has failed to state a valid claim of a violation of the Equal Protection Clause.

### G. The TCA does not violate Plaintiff's Due Process rights

Plaintiff asserts in his Petition that the City deprived him of "life, liberty, or property without due process." (Pet. ¶ 20.) Plaintiff does not state whether he is claiming a violation of his procedural due process rights or his substantive due process rights. The Court will address both.

### 1. Procedural Due Process

The due process clause of the Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property without due process of law. . . ." Procedural due process

---

[10] Disabled persons are not a suspect class for purposes of equal protection analysis; therefore, laws affecting the disabled are not subject to strict scrutiny. Hence, the Court has examined Plaintiff's claim under general equal protection standards and not under standards applied for the protection of "fundamental" interests. In sum, Plaintiff can state a claim only if the Court finds that the TCA's prohibition against the City's regulation of RFEs has no rational basis. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 442-46 (1985).

requires notice, a hearing, and a means of decision that does not offend the concept of fundamental fairness. *Hartwick v. Bd. of Tr. Of Johnson County Community College*, 782 F. Supp. 1507, 1511 (D. Kan. 1992). A plaintiff must meet a two-pronged test to establish a claim for violation of procedural due process rights. First, he must show that a life, liberty or a protected property interest was taken, and second, he must show that the procedural safeguards surrounding the deprivation were inadequate. *Board of Regents v. Roth*, 408 U.S. 564, 568-69 (1972); *Kirkland v. St. Vrain Valley Sch. Dist.*, 464 F.3d 1182, 1189 (10th Cir. 2006). Plaintiff has not alleged that the City has taken his life, liberty or a protected property interest without notice, hearing or means of decision. Hence, Plaintiff has not alleged a valid procedural due process claim.

### 2. Substantive Due Process

To state a substantive due process claim, a plaintiff must allege that a governmental action is arbitrary, irrational, or shocking to the contemporary conscience. *Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1257 (10th Cir. 2007) (citations omitted). A plaintiff must allege facts showing that a government's action was "arbitrary and oppressive" even when taken to further a legitimate governmental objective. *Seegmiller v. LaVerkin City,* 528 F.3d 762, 767 (10th Cir. 2008).  However, a violation of substantive due process cannot be used to impose liability whenever someone with governmental authority causes harm. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). On the contrary, a substantive due process claim must be based on government conduct that was intentional or at least unjustified by any legitimate government interest. *Id.* at 849. Under this standard, the Plaintiff's substantive due process claim fails because Plaintiff does not allege that the City's failure to regulate RFEs was an arbitrary or unjustified action. Nor has Plaintiff alleged that the City's failure to regulate RFEs constitutes

abusive behavior that shocks the conscience. *Id.*

       IT IS ORDERED that the Motion To Dismiss By Respondent City of Santa Fe (Doc. No. 16) is granted and the Plaintiff's Second Amended Petition For Writ Of Mandamus will be dismissed as to the City of Santa Fe.

 

_____
SENIOR UNITED STATES DISTRICT JUDGE